# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MICHELLE BRANDT**
    **Plaintiff,**

  **v.**          **Case No. 20-C-1471**

**ANDREW M. SAUL,**
**Commissioner of the Social Security Administration**
      **Defendant.**

---

## DECISION AND ORDER

Plaintiff Michelle Brandt seeks judicial review of the denial of her application for social security disability benefits. The Administrative Law Judge ("ALJ") assigned to the case concluded that plaintiff could, despite severe physical and mental impairments, perform a range of sedentary, simple work. Plaintiff argues that the ALJ improperly rejected the opinions of two of her treating providers supporting greater limitations. For the reasons that follow, I reject those arguments and affirm the ALJ's decision.

## I. FACTS AND BACKGROUND

### A. Plaintiff's Impairments

Plaintiff filed the instant application for benefits in February 2018, alleging that she became disabled as of November 1, 2017, due to a variety of conditions, including fibromyalgia, depression and anxiety, cervical fusion and knee replacements surgeries, lumbar degenerative disc disease, carpal tunnel syndrome, and Raynaud's disease. (Tr. at 303, 309, 364, 367.) She later amended the alleged onset date to January 1, 2018, to account for the December 2017 denial of a previous application she had filed in November 2015. (Tr. at 42,

110-32.)  The agency collected plaintiff's medical records regarding her various impairments, summarized below.

###    1.    Fibromyalgia

On May 10, 2017, plaintiff saw Dr. Zhijie Zhou, a rheumatologist, regarding pain and swelling in multiple joints since around October 2016.  (Tr. at 638.)  She complained of severe pain, aggravated by movement, as well as fatigue and weakness.  (Tr. at 639.)  On exam, Dr. Zhou noted 18/18 tender points (Tr. at 642), diagnosing fibromyalgia (Tr. at 644).  Dr. Zhou started plaintiff on Lyrica for treatment of fibromyalgia  (Tr. at 651), later switching to Cymbalta (Tr. at 656).

On January 17, 2018, Dr. Zhou prepared a "To Whom it May Concern" letter, stating:

> This is to certify that Michelle A. Brandt was seen by Dr. Zhijie Zhou in the Rheumatology Clinic at Aurora Health Care on 1/17/2018.  At that time it was determined she will only be able to work 4-5 hours per work shift / 20 hours per week.  This will be reevaluated in three months.

(Tr. at 597.)

On May 16, 2018, plaintiff reported that her symptoms were the same (Tr. at 660), with Dr. Zhou continuing her on naproxen and Cymbalta (Tr. at 662-63).  Dr. Zhou further noted: "Significant functioning impairment, work restriction 5 hours a day.  Max of 8 hours a day, needing the following day off."  (Tr. at 663.)

On September 19, 2018, plaintiff again complained of widespread pain, diffuse myalgia, and fatigue.  (Tr. at 1178.)  On exam, Dr. Zhou again noted 18/18 tender points (Tr. at 1179), stating: "Significant functioning impairment, work restriction 5 hours a day.  Max of 8 hours a day, needing the following day off.  Agree with disability."  (Tr. at 1181.)

On April 17, 2019, plaintiff reported that her symptoms were slightly better since their

2

last visit.  (Tr. at 1494.)  Dr. Zhou continued her medications, stating: "Significant functioning impairment.  Agree with disability."  (Tr. at 1497.)

### 2.    Mental Impairments

Plaintiff experienced long-term mental health issues, with psychiatric admissions in 2013 (Tr. at 1485), 2015 (Tr. at 1522), and twice in 2017 (Tr. at 537, 583).  She primarily treated with Rebecca Trewyn, APNP, commencing around 2015 (Tr. at 1590-92), in addition to seeing a counselor with Dodge County Human Services (Tr. at 1193).  Nurse Practitioner Trewyn diagnosed major depression and generalized anxiety disorder, prescribing medications.  (Tr. at 502, 507, 510, 512, 514, 516).

In April 2018, plaintiff appeared to be doing well, enjoying her part-time job at Walmart. On mental status exam, she displayed no psychomotor agitation, normal eye contact, and clear, coherent speech.  She was alert and oriented times four, with no evidence of thought disorder or dysfunction.  Her thought processes were linear, focused, and goal oriented.  (Tr. at 507.)  In early June 2018, plaintiff described her mood as "good" with Trewyn again noting plaintiff was "doing well," working at Walmart in the fabric department and "really enjoying it." (Tr. at 502.)  Plaintiff also told her counselor that she was looking into starting her own business doing crafting and had identified a store where she could rent space and place products.  (Tr. at 1195.)  Later that month, plaintiff told a different provider that she was experiencing increased depression and suicidal thoughts related to relationship issues and dental pain.  (Tr. at 1033, 1039-40.)

However, when she saw Trewyn in August 2018, plaintiff reported she was "[d]oing okay."  (Tr. at 1190.)  She continued to work at Walmart in the fabric department but reported that she wanted "to go back on registers for more socialization." (Tr. at 1190.)  She further

3

reported she had increased her hours to 27 per week. (Tr. at 1190.) On mental status exam, plaintiff displayed normal eye contact, calm and pleasant demeanor, clear and coherent speech, and linear thought processes. Trewyn concluded: "[Plaintiff] is doing well. Does not [have] any complaints at this visit. Her disability was denied again and she seems to be coping with this well. She has not had any thoughts of harming self." (Tr. at 1191.) Plaintiff also told her counselor in August 2018 that she was "trying to get a business plan together for her own business to look for funding." (Tr. at 1194.)

In October 2018, plaintiff again reported doing "okay." "She reports continued financial stressors but appears to be coping with them well at this time." (Tr. at 1193.) The counselor noted: "Overall client appears to be stable at this time and denies SI or HI." (Tr. at 1193.) In November 2018, plaintiff advised Trewyn that she needed knee surgery and would be off work for several weeks. (Tr. at 1518.) On mental status exam, she described her own mood as "I'm in a good mood lately." Trewyn noted that plaintiff "continues to do well." (Tr. at 1520.) In January 2019, plaintiff reported that her depression was low with no anxiety other than situational. She was eliciting support to help after her recent surgery. (Tr. at 1509.) Trewyn's assessment stated: "[Plaintiff] continues to do well. She has no complaints." (Tr. at 1517.) In February 2019, the counselor noted that plaintiff "appears to be doing well overall at this time in regards to her mood, despite some physical issues." (Tr. at 1508.)

In April 2019, plaintiff reported increased symptoms related to housing issues (Tr. at 1507-08, 1512-14), but the following month she told Trewyn: "I'm good. So far I believe I have June's rent so I am good." (Tr. at 1510.) She further reported wanting to increase her hours at work. (Tr. at 1510.) Trewyn's assessment stated: "[Plaintiff] is doing well, despite being denied from disability again. She continues to struggle with finances, but always seems to

4

make it work.  She describes her mood in stable terms, moderate depression and anxiety, but with no SI or plan."  (Tr. at 1512.)

In June 2019, plaintiff reported "her mood has been stable overall with only a day here or there where she feels more sad or anxious.  She is able to cope with these feelings positively and they subside in a day or so."  She further reported that she had applied for a job outside Dodge County, which could lead to her leaving the county.  The counselor concluded: "[Plaintiff] appears to be doing well at this time.  Her mood [is] stable and she denies times of SI.  This has been consistent over the past year and a half or more."  (Tr. at 1507.)

In October 2019, Trewyn prepared a report, listing diagnoses of major depression, severe, and generalized anxiety disorder, severe.  She stated that plaintiff experienced decompensation in mood and functioning when under stress, and "has never been able to maintain full-time employment since I have known her."  (Tr. at 1590.)  Trewyn identified signs and symptoms of decreased energy, thoughts of suicide (not recent), feelings of guilt or worthlessness, and difficulty thinking or concentrating.  (Tr. at 1590.)  Regarding plaintiff's functional limitations, Trewyn endorsed marked deficiencies in concentration and persistence, and in adaptation; and moderate limitations in understanding and memory, and in social interaction.  (Tr. at 1591.)  Finally, she indicated plaintiff would be absent from work about two days per month.  (Tr. at 1592.)

### 3.    Cervical and Carpal Tunnel Impairments

Plaintiff underwent cervical surgery at the C4, 5, 6 levels in October 2011 (Tr. at 1402, 1404, 1481) and right-sided carpal tunnel release in April 2016, both performed by Dr. Shekhar Dagam.  In March 2018, plaintiff returned to Dr. Dagam, noting that her hands were feeling great until she started a cashiering job at Walmart in November.  (Tr. at 601.)  On exam, Dr.

5

Dagam noted normal 5/5 strength except 5-/5 grip strength on the left. (Tr. at 606.) He referred her for an EMG, noting that jobs requiring repetitive movements of the hands would flare her symptoms and encouraging the use of splints when possible. (Tr. at 607.) The May 2018 EMG was normal (Tr. at 611), with no evidence of carpal tunnel syndrome or other neurogenic diagnosis (Tr. at 612).

In February 2019, plaintiff underwent a course of physical therapy for neck and left arm pain, which she attributed to her work as a cashier at Walmart. (Tr. at 1391.) Dr. Dagam subsequently ordered an MRI, which showed a disc herniation at C6-7. (Tr. at 1364-1368.) In March 2019, Dr. Dagam performed cervical fusion surgery at that level. (Tr. at 1370.) During a May 2019 follow-up, Dr. Dagam noted that plaintiff had returned to work at Walmart with a 10 pound lifting restriction. (Tr. at 1638.) She displayed 5/5 strength throughout the bilateral upper and lower extremities, aside from 5-/5 left grip. (Tr. at 1640-41.) Plaintiff reported that she was pleased with her improvements and hopeful for further gains with time. (Tr. at 1641). In June 2019, Dr. Dagam noted 5/5 strength in the upper extremities, intact sensation, and normal gait. (Tr. at 1585.) Dr. Dagam referred plaintiff for a course of physical therapy, which she completed in the summer of 2019. (Tr. at 1555.) At the end of therapy, plaintiff reported things were going okay at work and she was hoping to pick up more hours. (Tr. at 1544.) She further reported that she had returned to mowing the lawn and doing much of her normal activity, lifting up to 15 pounds. (Tr. at 1547.)

In October 2019, plaintiff returned to Dr. Dagam complaining of neck and lower back pain. (Tr. at 1649, 1654.) She had been working as a cashier without restrictions since July. (Tr. at 1649.) On exam, she displayed mild tenderness to palpation of the right scapular region and over the lower cervical spinous processes (Tr. at 1651), 5/5 strength throughout the upper

6

extremities, intact sensation, and normal gait. (Tr. at 1652.) A previous lumbar MRI revealed mild posterior disc bulging. (Tr. at 1097, 1657.) Dr. Dagam referred her for physical therapy, recommending she use a wrist splint at night and continue working as tolerated. (Tr. at 1652, 1659-63.)

### 4. Knees

In April 2018, plaintiff was seen for right knee pain, which had started the previous month at work. (Tr. at 1001-04.) Providers initially recommended conservative measures (Tr. at 1027), but after physical therapy and a cortisone injection failed to relieve her symptoms (Tr. at 1262) and an MRI revealed severe patellofemoral osteoarthritis (Tr. at 1259), plaintiff underwent right knee replacement surgery in December 2018. (Tr. at 1231-32, 1241.) Subsequent therapy notes documented that plaintiff received help from her mother, neighbor, and a friend during her recovery (Tr. at 1205) and within a few weeks she was able to return to part-time light duty work (Tr. at 1427). She discharged from therapy in January 2019, progressing well (Tr. at 1438-44). She subsequently complained of left knee pain (Tr. at 1335), undergoing surgery on that side in March 2019 (Tr. at 1340, 1348). Therapy notes again documented significant improvement in range of motion and ambulation (Tr. at 1306-20), and she discharged in April 2019 doing well functionally and ready to continue working on her own (Tr. at 1579).

## B. Agency Proceedings

With her February 2018 application, plaintiff submitted a function report, alleging that she was unable to work more than three days in a row and no more than four to five hour shifts, as working more than that brought on depression. She further reported that she could not work

7

at a computer due to hand issues and could not stand for long periods due to leg and knee issues. (Tr. at 386.) She wrote that she was able to care for her dog and tend to personal care (although standing in the shower was getting harder). (Tr. at 387.) She did not need reminders to take care of personal needs and was able to prepare simple meals and clean her house with breaks. (Tr. at 388.) She was also able to shop in stores and pay bills. (Tr. at 389.) She socialized little and reported problems getting along with family, friends, and others. (Tr. at 390.) She reported that she could lift no more than 20 pounds, squatting and climbing bothered her knees, standing bothered her back, and reaching bothered her neck. She could walk about 30 minutes before needing to rest for 15 minutes. She followed written instructions OK but sometimes needed to ask questions regarding spoken instructions. (Tr. at 391.) She also reported trouble with authority figures (e.g., her landlord) and that she had been fired from a job because she was hospitalized for several days due to depression. She further reported that she did not handle stress or changes in routine well. (Tr. at 392.) In a physical activities addendum, plaintiff wrote that she could continuously sit for 30 minutes, stand 15-30 minutes, and walk 15-30 minutes, and in a day sit for one hour, stand for 1-½ hours, and walk for 30 minutes. Her doctor had limited lifting to 20 pounds. (Tr. at 394.)

The agency denied the application initially on July 27, 2018, based on the review of two consultants. (Tr. at 171, 224.) Jason Kocina, Psy.D., found mild limitations in understanding, remembering, or applying information, interacting with others, and adapting or managing oneself; and moderate limitation in concentrating, persisting, or maintaining pace. (Tr. at 147.) In assessing plaintiff's mental residual functional capacity ("RFC"), Dr. Kocina found that plaintiff had no understanding and memory limitations, no social interaction limitations, and no adaptation limitations. (Tr. at 150-51.) She did have two moderate limitations in the

8

concentration and persistence area: in the ability to carry out detailed instructions, and in the ability to complete a normal workday without interruptions from psychologically based symptoms and perform at a consistent pace without unreasonable breaks.  (Tr. at 150-51.) Bernard Stevens, M.D., found plaintiff capable of light work, avoiding concentrated exposure to extreme cold due to a diagnosis of Raynaud's phenomenon.  (Tr. at 149-50.)

Plaintiff requested reconsideration (Tr. at 234), but on April 27, 2019, the agency maintained the denial (Tr. at 236).  Psychological consultant Kathleen O'Brien, Ph.D., agreed with Dr. Kocina's limitations, concluding that plaintiff "retains the ability to understand, learn, remember, perform and sustain simple tasks."  (Tr. at 186, 191-92.)  Medical consultant Torra Jones, M.D., concluded that plaintiff could perform a range of sedentary work (lifting up to 10 pounds, standing/walking four hours, sitting about six hours); occasionally climbing ramps/stairs and never climbing ladders/ropes/scaffolds; frequently stooping and occasionally kneeling, crouching, and crawling; frequently reaching bilaterally; and avoiding concentrated exposure to cold and moderate exposure to hazards (e.g., machinery, heights).  (Tr. at 188-90.)

Plaintiff then requested a hearing before an ALJ.  (Tr. at 243, 245.)

## C.    Hearing

On December 3, 2019, plaintiff appeared with counsel for her hearing before the ALJ. The ALJ also summoned a vocational expert ("VE") to offer testimony on jobs plaintiff might be able to do.  (Tr. at 37.)

Plaintiff testified that she lived alone in a house, had a high school education, and worked part-time at Walmart as a cashier (20 hours per week, consisting of four five-hour shifts).  (Tr. at 44.)  She was required to be on her feet the entire shift, aside from one 15-minute break, and received no (physical) accommodations.  (Tr. at 45.)  She testified that she

9

experienced some difficulties doing her job, i.e., her hands fell asleep or went numb, and she had problems standing because of her knees.  (Tr. at 46.)

Plaintiff testified to past employment as a dietary aide preparing and serving meals in an assisted living center.  (Tr. at 46.)  That job required her to be on her feet all day and lift 30 to 40 pounds.  (Tr. at 47.)  Before that, she worked as a customer service representative in the insurance industry; these were desk jobs, with no regular lifting requirements.  (Tr. at 47-48.)  Asked why she could not return to her past sit-down jobs, plaintiff referenced her depression and anxiety, as well as issues with her hands typing on a computer or doing other repetitive work.  (Tr. at 48-49.)   She further explained that these jobs would aggravate her depression because of the stress, and that she could not do any sit-down job for a full eight hours because of her back and hands.  (Tr. at 60.)

Plaintiff testified to two previous neck surgeries, but she still experienced neck pain, shoulder pain, and radiating arm pain, for which she took naproxen and amitriptyline.  She also continued in physical therapy.  (Tr. at 49.)  She stated that this condition caused her hands to go numb.  (Tr. at 50.)  She further testified that at the end of a work shift her shoulders, back, and legs hurt; she had to go home and sit with a heating pad and ice her legs.  (Tr. at 50, 54.)  Plaintiff explained that she had to work, despite the pain, to pay her bills; she had no safety net. (Tr. at 50.)

Plaintiff testified that her low back bothered her if she sat too long; she could not drive more than 30 minutes because of her back and her hands going numb.  (Tr. at 50-51.)  She was also receiving physical therapy for her back.  (Tr. at 51.)

Plaintiff further testified that she had partial replacements to both knees.  (Tr. at 51.)  The surgeries helped with the pain, but she still experienced stiffness from the weather and

10

sitting too long. (Tr. at 52.) Walking long distances also hurt her feet. (Tr. at 52.) She used the naproxen and amitriptyline for her knees as well. (Tr. at 53.)

Plaintiff also suffered from fibromyalgia, which caused joint pain. She used naproxen and amitriptyline for that condition as well. She took duloxetine for depression, which also helped the fibromyalgia. She still experienced pain despite the medications. (Tr. at 53.)

For depression and anxiety, plaintiff took hydroxyzine and duloxetine. Asked if the medications helped, plaintiff testified that she had not recently been hospitalized but still had bouts of depression and anxiety and suicidal thoughts. She had been hospitalized several times in the past, most recently in 2017. (Tr. at 56.) Walmart had granted her the accommodation of taking two days off per month for her depression and anxiety, if needed. (Tr. at 57.) Plaintiff testified that she had taken two days every month since May. (Tr. at 61.) She also testified to experiencing bouts of crying at work, two or three times a week. (Tr. at 61.) She reported no other problems doing the job, other than with her hands. (Tr. at 62.) She had no difficulties dealing with people on the job. (Tr. at 62-63.)

Plaintiff testified that on days off she cleaned her house, taking lots of breaks between rooms. (Tr. at 58.) She cooked pizza, macaroni and cheese, and nachos; she no longer enjoyed cooking because of the standing required. (Tr. at 58-59.) She received no assistance taking care of things around the house. (Tr. at 63.)

The VE classified plaintiff's past work as dietary aide, unskilled and medium; customer service representative, semi-skilled and sedentary; and administrative clerk, semi-skilled, light generally, sedentary as performed. The ALJ then asked a series of hypothetical questions, assuming a person of plaintiff's age, education, and work experience. (Tr. at 65.)

The first hypothetical assumed a person limited to sedentary work; never climbing

11

ladders, ropes, or scaffolds; occasionally climbing ramps and stairs; occasionally balancing, stooping, kneeling, crouching, and crawling; never exposed to workplace hazards, such as moving mechanical parts or heights; and limited to frequent reaching, handling, and fingering bilaterally. (Tr. at 66.) The VE testified that such a person could not perform plaintiff's past dietary aide job but could do the jobs of customer service representative and administrative clerk (as actually performed). (Tr. at 66.) The person could also perform other jobs, such as sorter, final assembler, and table worker. (Tr. at 66-67.)

The second hypothetical added a sit/stand option, permitting the person to stand for up to five minutes after 30 minutes of sitting without leaving the work station. The VE testified that the answer was the same. (Tr. at 67.)

The third hypothetical added a limitation to simple, routine, repetitive tasks in jobs involving only simple decision making and no more than occasional changes in work setting and limited to jobs with no fast paced or inflexible production requirements. (Tr. at 67.) The VE testified that such a person could not perform plaintiff's past work but could do the other jobs cited in response to hypothetical one. (Tr. at 67-68.)

The VE testified that no jobs would be available for a person limited to working five hours per day or 20 hours per week, or for a person who would be absent more than two days per month on an ongoing basis. (Tr. at 68.) If the person covered in the first and second hypotheticals were limited to occasional handling and fingering bilaterally, there would also be no jobs. (Tr. at 68-69.)

D.     **ALJ's Decision**

On January 14, 2020, the ALJ issued an unfavorable decision. (Tr. at 12.) Conducting the standard five-step evaluation process, the ALJ determined at step one that plaintiff had not

engaged in substantial gainful activity ("SGA") since January 1, 2018, the amended alleged onset date. While plaintiff continued to work part-time—about 20 hours per week in a light position at Walmart—this work activity did not rise to the level of SGA. (Tr. at 17.)

At step two, the ALJ determined that plaintiff suffered from a number of severe impairments including cervical and lumbar spine degenerative disc disease, fibromyalgia, carpal tunnel syndrome, bilateral partial knee replacements, depressive disorder, generalized anxiety disorder, and borderline personality disorder. (Tr. at 18.) At step three, the ALJ determined that none of these impairments met or equaled a Listing. (Tr. at 19.)

The ALJ evaluated plaintiff's mental impairments under Listings 12.04, 12.06, and 12.08, which are satisfied if the claimant has one "extreme" or two "marked" limitations under the "paragraph B" criteria: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. at 19.)

The ALJ found a mild limitation in understanding, remembering, or applying information, noting that while plaintiff reported deficits in remembering, understanding, and following instructions, she conceded being able to follow written instructions. (Tr. at 19.) She had also previously worked in a semi-skilled position, despite her long-term mental health conditions. (Tr. at 19-20.) Additionally, she displayed appropriate fund of knowledge and intact memory during objective evaluations. (Tr. at 20.)

The ALJ found a mild limitation in interacting with others. Plaintiff reported getting agitated easily; having trouble getting along with family, friends, and others; and not spending time with others. However, the record documented that others helped plaintiff following surgery and that she previously had boyfriends. She also regularly worked as a cashier at Walmart,

13

a position involving constant interaction with others. Further, she reported never losing a job due to inability to get along with others. (Tr. at 20.)

The ALJ found a moderate limitation in concentrating, persisting, or maintaining pace. Plaintiff endorsed difficulties concentrating, completing tasks, and paying attention for more than 10 minutes. She also experienced acute periods of depression, which would affect her ability to concentrate, persist, and maintain pace. However, she also evidenced intact concentration and attention during objective exams, had been able to persist and maintain pace at her Walmart position, and the record showed her engaging in a number of other activities requiring concentration and persistence such as working on a business plan to start a craft business, living alone, preparing meals, performing household chores, and paying bills. (Tr. at 20.)

Finally, the ALJ found a moderate limitation in adapting or managing oneself. Plaintiff reported not handling stress or adapting to change well, as well as having some problems managing her personal care due to physical problems. On the other hand, she reported living alone, caring for her dog, managing her personal care without reminders, preparing meals, performing household chores, shopping, managing money, and getting along with authority figures. (Tr. at 20.)

Prior to step four, the ALJ found that plaintiff had the RFC to perform sedentary work, except that she was limited to frequent handling, reaching, and fingering; occasional climbing and postural movements; avoidance of workplace hazards such as moving mechanical parts and unprotected heights; and simple, routine and repetitive tasks involving only simple decision making, no more than occasional changes in work setting, and no fast paced or inflexible production requirements. In making this finding, the ALJ considered plaintiff's statements

14

regarding her symptoms and the medical opinion evidence. (Tr. at 21.)

In considering plaintiff's symptoms, the ALJ noted the required two-step process, under which he first had to determine whether plaintiff had an underlying medically determinable impairment that could reasonably be expected to produce the pain or other symptoms. Second, once such an impairment was shown, he had to evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they affected plaintiff's work-related activities. For this purpose, if the statements were not substantiated by objective medical evidence, the ALJ had to consider the other evidence in the record to determine if the symptoms limited plaintiff's work-related abilities. (Tr. at 21.)

Plaintiff alleged disability due to the residuals of cervical spine fusions, degenerative disc disease, fibromyalgia causing pain and fatigue, knee problems, depression, and anxiety. Prior to the hearing, plaintiff reported that these impairments affected her ability to perform a variety of functions, and at the hearing she testified that the combination of her impairments precluded her from working on a full-time basis. (Tr. at 21.)

The ALJ first reviewed the objective medical evidence, which documented a cervical fusion in 2011. Plaintiff subsequently developed neck pain radiating into her left arm with intermittent tingling in her right hand, and in March 2019 she underwent a second cervical fusion, followed by physical therapy. (Tr. at 22.) The record also documented low back pain, with imaging showing degenerative disc problems and examinations revealing spinal tenderness and reduced range of motion. (Tr. at 22.) The record further documented diffuse myalgias, with 18/18 tender points; providers diagnosed fibromyalgia, prescribing Cymbalta and amitriptyline. (Tr. at 22.) The record also contained February 2016 EMG testing revealing right and left carpal tunnel syndrome, and plaintiff underwent surgery on the right in April 2016. She

15

reported experiencing increased hand pain since working as a cashier, and exams showed diminished grip strength on the left. Providers recommended she use splints. Plaintiff also complained of bilateral knee pain, starting in February or March 2018, undergoing right knee replacement surgery in December 2018 and left knee replacement surgery in March 2019. (Tr. at 22.)

Regarding her mental health, providers diagnosed plaintiff with depressive disorder, generalized anxiety disorder, and borderline personality disorder, with the record documenting multiple hospitalizations due to those conditions prior to her amended alleged onset date. In June 2018, plaintiff reported increased depression and suicidal ideation stemming from pain and relationship issues. She again reported increased symptoms in April 2019 due to relationship and financial issues. She received counseling and medications for her mental health conditions. (Tr. at 23.)

The ALJ concluded that, while plaintiff's medically determinable impairments could reasonably be expected to produce some of the symptoms alleged, plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical and other evidence of record. The ALJ provided several reasons for this finding. (Tr. at 23.)

First, plaintiff had consistently been able to work 20 hours per week at a light exertional level job requiring significantly more physical activity than did the RFC. "This suggests she should be able to tolerate more hours in a sedentary type position." (Tr. at 23.)

Second, while plaintiff had undergone multiple cervical fusions, she regularly exhibited good range of motion of her neck prior to her second surgery. Treatment notes also showed plaintiff could rotate her head laterally and flex her neck at full strength both before and after

16

her surgeries. Imaging showed a stable fusion following the March 2019 operation. (Tr. at 23.)

Third, imaging of plaintiff's back showed only mild bulging. She also regularly exhibited good range of motion in her hips, shoulders, elbows, wrists, and fingers despite her spinal conditions and fibromyalgia. Similarly, she displayed normal strength in the upper and lower extremities (aside from the left hand at times), intact sensation, and normal gait (outside of the recovery period from her knee surgeries). (Tr. at 23.)

Fourth, despite continuing to complain of bilateral hand pain, May 2018 EMG testing was negative, showing no carpal tunnel or other neurogenic diagnosis. She generally maintained good bilateral grip strength: 5- to 5/5 on the left and 5/5 on the right. Similarly, she demonstrated good range of motion of the fingers and wrists. (Tr. at 23.)

Fifth, plaintiff informed providers that she had improved functioning following her bilateral partial knee replacements. In August 2019, providers indicated he was doing well overall despite her impairments and asking for more work hours. More recent notes showed plaintiff again evidencing a normal gait. (Tr. at 24.)

Sixth, plaintiff was able to engage in a number of activities despite her physical conditions. In her pre-hearing reports, plaintiff reported living alone, caring for her dog, preparing meals, performing household chores, and shopping. Physical therapy notes also showed her lifting 15 pounds, mowing the lawn, and being back to many of her normal activities. She was further able to work at the light level for 20 hours per week. (Tr. at 24.)

Seventh, regarding her mental health, plaintiff appeared alert and oriented with intact memory, clear and fluent speech, appropriate fund of knowledge, and intact attention and concentration during a March 2018 exam. A May 2018 exam was similarly favorable. While she reported increased symptoms in June 2018, by August 2018 she was doing OK, asking

17

to go back to the registers at Walmart for more socialization, increased her work hours to 27 per week, and having low anxiety. In October 2018, she appeared stable and coping well with stressors, and by January 2019 she reported her depression was low and her anxiety situational. Despite an increase in her symptoms in April 2019, by June 2019 she again had a stable mood, was applying for jobs outside the county, and had no suicidal ideation; in August 2019, she asked for more hours at work. (Tr. at 24.)

Thus, after a review of the entire record, the ALJ found that plaintiff was not as limited as she alleged. Instead, she remained capable of performing sedentary work, as her bilateral knee replacements, reported diffuse pain, and spinal problems would preclude the standing/walking requirements of light or greater exertional work. Her history of carpal tunnel with reports of ongoing hand pain, as well as her cervical fusions with reports of upper extremity pain, restricted her to frequent reaching, handling, and fingering bilaterally. Additionally, her spinal problems, knee replacements, and fibromyalgia limited her to occasional climbing and postural movements. Her reported pain, prescribed medication, and fatigue precluded exposure to workplace hazards such as moving mechanical parts and unprotected heights. (Tr. at 24.) Finally, her mental impairments with resulting moderate deficits in the third and fourth paragraph B areas reduced her to simple, routine, and repetitive tasks involving only simple decision making and no more than occasional changes in work setting with no fast paced or inflexible production requirements. (Tr. at 24-25.)

The ALJ then considered the various medical opinions in the record. The ALJ found the July 2018 opinion of agency medical consultant Dr. Stevens not persuasive. Dr. Stevens found plaintiff capable of light work, but this was not consistent with her subsequently requiring bilateral knee replacements and a cervical fusion at C6-7, which precluded her from the

18

standing/walking requirements of light work and limited her to sedentary work. (Tr. at 25.)

The ALJ found generally persuasive the April 2019 opinion of agency medical consultant Dr. Jones, who limited plaintiff to a range of sedentary work. The ALJ noted that Dr. Jones was familiar with the rules and regulations for disability determinations, and her restrictions on lifting and postural activities appeared to properly account for the combination of plaintiff's impairments. The ALJ did find that plaintiff's knee replacements limited her to two hours of standing/walking, rather than four; her spinal pain, knee replacements, and fibromyalgia reduced her to occasional rather than frequent stooping or balancing; and given her pain, fatigue, and medications, she should avoid all exposure to hazards. (Tr. at 25.)

The ALJ also found generally persuasive the opinions of the agency psychological consultants, Drs. O'Brien and Kocina, as they were also familiar with the rules and regulations for disability determinations. Their opinions finding moderate deficits in concentrating, persisting, or maintaining pace and a limitation to simple tasks were consistent with the record. The ALJ found that plaintiff's ability to maintain employment for nearly two years in an unskilled job, as well as the findings of intact memory, attention, and concentration during exams, consistent with those restrictions. However, given her reported trouble adapting to change and handling stress, with increased symptoms when experiencing financial stress and relationship problems, the ALJ found moderate deficits in adapting or managing herself. He therefore added restrictions of only simple decision making and no more than occasional changes in work setting with no fast paced or inflexible production requirements. (Tr. at 25.)

The ALJ found the various opinions from Dr. Zhou, plaintiff's treating rheumatologist, not persuasive. Dr. Zhou limited plaintiff to four to five hour workdays, or eight hour workdays with a day off in between, further stating that she agreed with disability. The ALJ provided several

19

reasons for his determination. First, Dr. Zhou failed to set forth a function-by-function analysis to support the opinion, and the statement that plaintiff was "disabled" touched on a matter reserved for the Commissioner. Second, Dr. Zhou did not account for the fact that the job plaintiff currently performed was more demanding than the restrictions set forth in the RFC. Third, Dr. Zhou provided no explanation for the hour restrictions, and the record showed plaintiff working 27 hour weeks at times. Fourth, the record did not support such restrictions, as plaintiff regularly appeared with good range of motion of her hips, shoulders, elbows, wrists, and fingers, normal strength in the upper and lower extremities, and normal gait (outside of her recovery period from knee surgeries).[1] (Tr. at 26.)

Finally, the ALJ found the October 2019 opinion of nurse practitioner Trewyn not persuasive. First, Trewyn's report of moderate deficits in understanding and memory was contradicted by plaintiff's previous work in a semi-skilled position and her display of appropriate fund of knowledge and intact memory during objective evaluations. Second, Trewyn's assessed moderate deficits in social interaction were inconsistent with plaintiff working as a cashier, asking to return to that position for more socialization after previously transferring to the fabric department, having friends, dating, appearing pleasant during exams, and never losing a job due to trouble getting along with others. Third, the assessed marked deficiencies in concentration and persistence were not congruent with the evidence showing intact concentration and attention during exams, maintaining attention and pace at her job at Walmart, and engaging in other activities requiring concentration and persistence (e.g., working

_____

[1]The ALJ also discounted various opinions from Dr. Dagam, plaintiff's treating neurosurgeon. (Tr. at 26-27.) Plaintiff does not challenge that finding, so I do not discuss it further.

20

on a business plan, living alone, preparing meals, performing household chores, and paying bills). Fourth, the assessed marked deficits in adaptation were not consistent with Trewyn's own treatment notes showing plaintiff doing well and always seeming to make it work despite struggling with finances. Similarly, plaintiff's ability to live alone, care for a dog, manage her personal care without reminders, prepare meals, perform household chores, shop, and manage money suggested better adaptation and management skills than Trewyn asserted. And the alleged need for more than two absences per month and part-time work was speculative, without explanation, and contrary to the treatment notes showing plaintiff generally doing well with good mental status examination findings despite her impairments. (Tr. at 27.)

At step four, the ALJ found plaintiff unable to perform her past relevant jobs of dietary aide and customer service representative. The former involved medium work, exceeding the sedentary limitation, and the latter involved semi-skilled tasks, exceeding the limitation to simple, routine, and repetitive tasks. (Tr. at 27.)

At step five, however, the ALJ found that plaintiff could perform other jobs, as identified by the VE, including sorter, final assembler, and table worker. (Tr. at 28-29.) The ALJ accordingly found plaintiff not disabled and denied the application. (Tr. at 29.)

On August 3, 2020, the Appeals Council denied plaintiff's request for review (Tr. at 3, 302), making the ALJ's decision the final word from the Commissioner. See Kaplarevic v. Saul, 3 F.4th 940, 942 (7th Cir. 2021). This action followed.

## II. STANDARD OF REVIEW

A reviewing court will "reverse only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." Martin v. Saul, 950 F.3d 369, 373 (7th Cir. 2020). "Substantial evidence" is not a demanding requirement: it means only such relevant

21

evidence as a reasonable mind might accept as adequate to support a conclusion.  Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).  Even if reasonable minds could differ on the weight the ALJ gave to the evidence, the reviewing court will not substitute its judgment for the ALJ's by re-weighing the evidence.  Karr v. Saul, 989 F.3d 508, 513 (7th Cir. 2021); see also Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020) ("We review the entire record, but we do not replace the ALJ's judgment with our own by reconsidering facts, reweighing or resolving conflicts in the evidence, or deciding questions of credibility.").  Finally, while the ALJ must in rendering a decision build a logical bridge from the evidence to his conclusions, he need not provide a complete written evaluation of every piece of testimony and evidence.  Pepper v. Colvin, 712 F.3d 351, 362 (7th Cir. 2013).

## III.  DISCUSSION

Plaintiff argues that the ALJ erred in evaluating the opinions of Dr. Zhou, her treating rheumatologist, and nurse practitioner Trewyn, her psychiatric provider. (Pl.'s Br. at 10.) Under the applicable regulations, a "medical opinion" is a statement from a medical source about what the claimant can still do despite her impairments and whether she has one or more impairment-related limitations or restrictions in the following abilities: (i) the ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); (ii) the ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting; (iii) the ability to perform other demands of work, such as seeing, hearing, or using other senses; and (iv) the ability to adapt to environmental conditions, such

as temperature extremes or fumes. 20 C.F.R. § 404.1513(a)(2). Medical opinions are evaluated based on a number of factors, including supportability (how much support the source offers for the opinion), consistency (how consistent the opinion is with the other evidence), relationship with the claimant (how often the source saw the claimant and for what purpose), specialization (whether the source is a specialist in the impairment at issue), and familiarity with the other evidence in the record or an understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). The most important factors are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2).

## A. Dr. Zhou

In January 2018, Dr. Zhou opined that plaintiff would "only be able to work 4-5 hours per work shift / 20 hours per week," with this restriction to be re-evaluated in three months. (Tr. at 597.) In May 2018, Dr. Zhou noted: "Significant functioning impairment, work restriction 5 hours a day. Max of 8 hours a day, needing the following day off." (Tr. at 663.) In September 2018, Dr. Zhou indicated: "Significant functioning impairment, work restriction 5 hours a day. Max of 8 hours a day, needing the following day off. Agree with disability." (Tr. at 1181.) And in April 2019, Dr. Zhou stated: "Significant functioning impairment. Agree with disability." (Tr. at 1497.)

As indicated above, the ALJ found these opinions unpersuasive. Dr. Zhou failed to set forth a function-by-function analysis, and her statement that plaintiff was "disabled" touched on a matter reserved for the Commissioner; plaintiff was currently working a job that was more physically demanding than the ALJ's RFC assessment required; Dr. Zhou provided no explanation for the hour restrictions, and the record showed plaintiff working 27 hour weeks at times; and the treatment notes did not support Dr. Zhou's restrictions. (Tr. at 26.)

23

Plaintiff contends that there is no requirement in the regulations that a medical opinion contain a function-by-function analysis, and the function Dr. Zhou did discuss (e.g., the hours plaintiff could sustain) correlates with the VE's testimony regarding the requirements of competitive employment. (Pl.'s Br. at 11-12, citing Tr. at 68: noting that a person limited to 20 hours per week could not sustain competitive employment.) Plaintiff further contends that Dr. Zhou's agreement with disability provides no reason to reject the rest of her opinion outright. (Pl.'s Br. at 12.)

The ALJ did not reject Dr. Zhou's opinions outright because of these deficiencies. Rather, he cited the limited and conclusory nature of the opinions as one reason for his determination. See 20 C.F.R. § 404.1520c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."); see also Loveless v. Colvin, 810 F.3d 502, 507 (7th Cir. 2016) ("[T]he ALJ did not have to accept Dr. Cusack's October 2012 conclusory statement that Loveless could not work. The ALJ needed only to weigh Dr. Cusack's assessments about the nature and severity of Loveless's impairments, which he did.").[2]

---

[2]Under the old regulations, a statement that the claimant was "disabled" or "unable to work" did not qualify as a "medical opinion" at all, as this was an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d). The Seventh Circuit held that while the ALJ need not give any special significance to a treating source's conclusion on the ultimate issue, the ALJ could not simply disregard the opinion on that basis. See, e.g., Kelham v. Berryhill, 751 Fed. Appx. 919, 923 (7th Cir. 2018). The ALJ did not violate that rule here, providing several additional reasons for discounting Dr. Zhou's opinion. The Commissioner suggests that Dr. Zhou's statements were not medical opinions (Def.'s Br. at 14-15), but the ALJ concluded that they were, despite their limited and conclusory nature.

24

Plaintiff next argues that the ALJ erred in relying on her part-time work. (Pl.'s Br. at 12, citing Wilder v. Chater, 64 F.3d 335, 337-38 (7th Cir. 1995) ("The fact that someone is employed is not proof positive that he is not disabled, for he may be desperate and exerting himself beyond his capacity, or his employer may be lax or altruistic.".) Plaintiff notes her testimony that she experienced pain after her shifts, but that she had to continue working to pay her bills. (Pl.'s Br. at 12, citing Tr. at 50.)

Again, the ALJ did not reject plaintiff's claim outright based on her part-time work. The ALJ acknowledged that this work did not rise to the level of SGA. As the Seventh Circuit has held, however, an ALJ may consider, as part of the analysis, a claimant's ability to perform even part-time work. See Berger v. Astrue, 516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week indicated that Berger was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled.").[3]

Plaintiff criticizes the ALJ's suggestion that, because she could handle 20 hours per week of light work, she could sustain full-time employment at the sedentary level. She contends that no medical source reached that conclusion, and it is unclear where the ALJ gleaned this assessment otherwise. (Pl.'s Br. at 12.)

---

[3]The Seventh Circuit has cautioned that part-time work is not good evidence of ability to engage in full-time employment where the claimant receives significant accommodations allowing her to perform that work. See, e.g., Vanprooyen v. Berryhill, 864 F.3d 567, 571 (7th Cir. 2017). In the present case, the ALJ asked plaintiff if she received any accommodations at work, such as a stool or extra breaks, and plaintiff responded: "As of right now, no." (Tr. at 45.) Later, on questioning from counsel, plaintiff testified that the employer allowed her to take off two days per month, if needed, due to her depression and anxiety. (Tr. at 57.) Plaintiff briefly mentions the two days off accommodation (Pl.'s Br. at 12; Pl.'s Rep. Br. at 1), but she develops no argument that the ALJ erred in concluding that her ability to physically perform part-time light work suggested she could perform full-time sedentary work. In any event, even if the ALJ placed too much weight on this factor, any error was harmless as he provided several other reasons for his conclusion. See Simila v. Astrue, 573 F.3d 503, 516 (7th Cir. 2009).

25

Agency consultant Dr. Jones opined that plaintiff could handle a range of full-time sedentary work, and the ALJ found her opinion "generally persuasive." (Tr. at 25.) In any event, an ALJ is not required to base the RFC assessment entirely on medical opinions, see Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007), and he may draw reasonable inferences from the record, see Stevenson v. Chater, 105 F.3d 1151, 1155 (7th Cir. 1997). Plaintiff fails to demonstrate that it was unreasonable for the ALJ to surmise that she could handle more hours of less demanding work. The Seventh Circuit rejected a similar argument in Williams-Overstreet v. Astrue, 364 Fed. Appx. 271, 276-77 (7th Cir. 2010):

> The ALJ . . . properly considered Mrs. Overstreet's part-time work in his assessment. Although a claimant with a job may still be found disabled, see Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005), an ALJ's assessment of residual functional capacity must be based on the relevant evidence in the record, which includes "reports of daily activities" and "evidence from attempts to work," see SSR 96-8p, 1996 SSR LEXIS 5. It was reasonable for the ALJ to conclude that Mrs. Overstreet's job at the airport—transporting passengers in a golf cart, and sometimes pushing them in wheelchairs, six hours a day, four days a week—suggested that her impairments did not limit her as much as she claimed, and that she could perform sedentary work as a data-entry clerk or administrative assistant. The vocational expert said that Mrs. Overstreet's airport job required "medium" exertion. A person who can do such work is ordinarily also considered physically able to do sedentary work. See 20 C.F.R. § 404.1567(c).

Plaintiff further argues that the treatment notes provide ample explanation for the hour restrictions. The ALJ cited findings regarding range of motion, strength, sensation, and gait, yet he said nothing about Dr. Zhou's findings of 18/18 tender points, diffuse myalgia, and severe fatigue. This, plaintiff contends, constituted impermissible cherry-picking and failure to recognize the complex and intermittent nature of fibromyalgia symptoms. (Pl.'s Br. at 13, citing SSR 12-2p.)

The ALJ discussed Dr. Zhou's findings earlier in his decision. (Tr. at 22: "In addition, the claimant noted diffuse myalgias affecting all four extremities . . . as well as neck and back with

26

associated muscle tenderness, morning stiffness, and severe fatigue . . . Upon examination, she consistently exhibited 18 out of 18 tender points[.]".) The ALJ accepted that plaintiff carried a fibromyalgia diagnosis based on the tender point exams (Tr. at 22), and he later explained that due to her reported pain and asserted fatigue plaintiff was limited to a reduced range of sedentary work with limited climbing and no exposure to hazards. (Tr. at 24.) Plaintiff develops no argument that the ALJ was compelled, based on the fibromyalgia diagnosis and her reports of pain and fatigue, to find her limited to part-time work. See Schaaf v. Astrue, 602 F.3d 869, 875 (7th Cir. 2010) (holding that subjective reports in treatment notes did not compel ALJ to accept treating source report that the claimant could not sustain full-time work); see also Skinner v. Astrue, 478 F.3d 836, 845 (7th Cir. 2007) ("[T]he existence of these diagnoses and symptoms does not mean the ALJ was required to find that Skinner suffered disabling impairments."). And contrary to plaintiff's suggestion, nothing in SSR 12-2p "limit[s] the evidence an ALJ can consider in evaluating the severity of fibromyalgia for purposes of determining a residual functioning capacity." Gebauer v. Saul, 801 Fed. Appx. 404, 410 (7th Cir. 2020).[4]

---

[4]In reply, plaintiff states that the very nature of fibromyalgia is that it causes significant fatigue and pain. (Pl.'s Rep. Br. at 3.) As courts have noted, that a condition often causes certain symptoms does not mean that a given claimant with that condition suffers from those symptoms, much less that her symptoms are of disabling severity. Stobbe v. Kijakazi, No. 20-C-777, 2021 U.S. Dist. LEXIS 148493, at *70 (E.D. Wis. Aug. 9, 2021) (citing Schmidt v. Barnhart, 395 F.3d 737, 746 (7th Cir. 2005); Vasquez v. Berryhill, No. 17-C-1763, 2018 U.S. Dist. LEXIS 240169, at *55 (E.D. Wis. Oct. 25, 2018)). Plaintiff argues that Dr. Zhou's opinions are supported by the objectively observed fibromyalgia tender points, as well as pain and fatigue, findings the ALJ failed to address. (Pl.'s Rep. Br. at 4.) As discussed in the text, the ALJ did address these findings. The tender points supported a finding of fibromyalgia as a severe impairment, but plaintiff fails to explain why they required the ALJ to find her limited to part-time work. The ALJ also addressed plaintiff's reports of pain and fatigue, finding that they limited her to a reduced range of sedentary work. Plaintiff fails to explain why these reports compelled the ALJ to find her limited to part-time work. Plaintiff complains that the ALJ did not

Plaintiff acknowledges the August 2018 treatment note indicating that she increased her hours to 27 per week. (Tr. at 1190.) However, she contends that this note pre-dates multiple surgeries and was either an outlier or an error; other records describe her working 20 hours per week or less. (Pl.'s Br. at 13.)

Plaintiff provides no basis for concluding that this notation was error. Nor does she address the evidence, cited by the ALJ, that in the summer of 2019 (following her surgeries) she asked for more work hours. (Tr. at 24, 1544.)

In reply, plaintiff contends that it is unclear how one outlier noted, created over a year before the ALJ's decision, was cause to reject Dr. Zhou's opinion out of hand. (Pl.'s Rep. Br. at 5.) The ALJ provided several reasons for discounting Dr. Zhou's opinion; he did not reject it out of hand based on this single note. As indicated, he further supported his finding with evidence that plaintiff asked for more work hours after recovering from her surgeries in the summer of 2019.

Plaintiff contends that if the ALJ was confused about the basis for the opinions he should have re-contacted Dr. Zhou for clarification. (Pl.'s Br. at 14.) While ALJs retain this option, a reviewing court defers to the ALJ's reasoned judgment as to when further inquiry is warranted. See Nelms v. Astrue, 553 F.3d 1093, 1098 (7th Cir. 2009); see also Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled."). And where, as here, a claimant represented by counsel, an ALJ may presume she has made her

_____

explain how he considered the medically documented manifestations of fibromyalgia in evaluating Dr. Zhou's opinions. (Pl.'s Rep. Br. at 4.) This overlooks the court's obligation to read an ALJ's decision as a whole. See, e.g., Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015).

best case for benefits.  Skinner, 478 F.3d at 842.

Finally, plaintiff indicates that the ALJ could not have properly rejected Dr. Zhou's opinions solely by finding the agency medical consultant's report persuasive.  (Pl.'s Br. at 14, citing Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice.").)  The ALJ did not do that here; as discussed above, he provided numerous independent reasons for finding Dr. Zhou's opinions unpersuasive.  He also explained why he found Dr. Jones's report persuasive, a finding plaintiff does not specifically challenge.  Plaintiff does note that the ALJ adopted a more restrictive physical RFC than either agency medical consultant assessed.  (Pl.'s Br. at 14.)  However, she does not explain how this was error.  See Thomas v. Colvin, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide."); Schmidt, 496 F.3d at 845 (noting that RFC is based on the entire record, not just doctors' opinions); Ware v. Colvin, No. 14 CV 4458, 2016 U.S. Dist. LEXIS 64271, at *19 (N.D. Ill. May 16, 2016) (rejecting as "misguided" the claimant's argument that the ALJ erred by finding her more limited than did the agency consultant).

In reply, plaintiff contends that the problem is that the ALJ not only failed to adopt the agency consultants' limitations but also that the ALJ did so in the context of rejecting Dr. Zhou's opinions without a valid explanation.  (Pl.'s Br. at 4.)  This argument again seems to assume that the RFC determination must be backed by a particular doctor's opinion, but that is not the rule; RFC is based on the entire record.  Plaintiff also contends in reply that the ALJ should have favored Dr. Zhou over the agency consultants based on their long-term treating

29

relationship and Dr. Zhou's specialty in rheumatology. (Pl.'s Rep. Br. at 4-5.) The ALJ acknowledged that Dr. Zhou was plaintiff's "treating rheumatologist" (Tr. at 26), and plaintiff fails to explain what additional consideration was required.

## B. Nurse Practitioner Trewyn

In October 2019, nurse practitioner Trewyn prepared a report listing diagnoses of major depression, severe, and generalized anxiety disorder, severe. (Tr. at 1590.) Trewyn endorsed marked limitations in concentration/persistence and adaptation, and moderate limitations in understanding/memory and social interaction. (Tr. at 1591.) Trewyn further indicated that plaintiff would be absent from work about two days per month. (Tr. at 1592.)

As indicated above, the ALJ found these opinions not persuasive. Trewyn's report of moderate deficits in understanding and memory was contradicted by plaintiff's previous work in a semi-skilled position and her display of appropriate fund of knowledge and intact memory during evaluations. Trewyn's assessed moderate deficits in social interaction were inconsistent with plaintiff working as a cashier, asking to return to that position for more socialization, having friends, dating, appearing pleasant during exams, and never losing a job due to trouble getting along with others. Trewyn's assessed marked deficiencies in concentration and persistence were not congruent with the evidence showing intact concentration and attention during exams, maintaining attention and pace at her job at Walmart, and engaging in various other activities requiring concentration and persistence. The assessed marked deficits in adaptation were not consistent with Trewyn's own treatment notes, as well as with plaintiff's ability to live alone, care for a dog, manage her personal care, prepare meals, perform household chores, shop, manage money, and get along with authority figures. And the alleged need for two absences per month and part-time work was speculative, without explanation, and contrary to the

30

treatment notes showing plaintiff generally doing well with good mental status examination findings.  (Tr. at 27.)

Plaintiff argues that the ALJ's assessment of the mental health treatment notes was incomplete.  She states that she was hospitalized four times for suicidal thoughts before the alleged onset date, some treatment notes during the relevant period document passive suicidal ideation, and she continued to present with varying degrees of depression, anxiety, and mood/energy abnormalities.  (Pl.'s Br. at 16.)

While an ALJ may not ignore entire lines of evidence contrary to his conclusion, see, e.g., Hardy v. Berryhill, 908 F.3d 309, 312 (7th Cir. 2018), neither is he required to address in writing every piece of evidence in the record, see, e.g., Deborah M. v. Saul, 994 F.3d 785, 788 (7th Cir. 2021).  Plaintiff demonstrates no significant omission here.  The ALJ acknowledged plaintiff's "history of multiple hospitalizations due to [her mental impairments] occurring prior to her amended alleged onset date."[5]  (Tr. at 23.)  The ALJ also acknowledged that plaintiff continued to experience symptoms during the period at issue.  Specifically, he cited her report of suicidal ideation in June 2018, and her report of increased symptoms in April 2019 due to

---

[5]The parties debate whether the ALJ was required to consider this evidence, with the Commissioner noting that the hospitalizations occurred prior to the alleged onset date and during the period covered by the previous ALJ denial (Def.'s Br. at 20), and plaintiff replying that the regulations require development of the medical record at least 12 months preceding the application (Pl.'s Rep. Br. at 7).  The debate is academic, as the ALJ did consider this evidence, and plaintiff fails to explain what more he was required to do.  At the hearing, plaintiff conceded that she had not been hospitalized since 2017.  (Tr. at 57.)  And contrary to plaintiff's suggestion (Pl.'s Rep. Br. at 7), the ALJ did consider evidence of suicidal ideation during the period at issue (Tr. at 23), explaining that after periods of increased symptoms plaintiff appeared to improve  (Tr. at 24).  Plaintiff's claim that the ALJ failed to grapple with the abnormal findings is incorrect, as discussed in the text.  (See Pl.'s Rep. Br. at 8.)  Plaintiff's argument that the ALJ needed to specifically discuss the abnormal findings in the section of his opinion addressing Trewyn's report (Pl.'s Rep. Br. at 8) again overlooks the court's obligation to read the decision as a whole.

31

additional stressors.  (Tr. at 23.)  However, he noted that plaintiff appeared to recover quickly following these exacerbations.  By August 2018, plaintiff reported doing okay, asking to go back to the registers at Walmart for more socialization, increasing her work hours to 27 per week, and having low anxiety.  Subsequent notes from late 2018 and early 2019 indicated that her depression was low and her anxiety situational.  Despite the increase in symptoms in April 2019, by June 2019 plaintiff again had a stable mood, was applying for jobs outside the county, and reported no suicidal ideation.  In August 2019, she asked for more hours at work.  (Tr. at 24.)  Plaintiff does not acknowledge the ALJ's discussion of this evidence.

Plaintiff next argues that the ALJ erred by relying on her part-time work and other activities.  She notes that Walmart accommodated her with two days off per month, which she had been using.  She further notes that there is no evidence her "business plan" ever came to fruition.  She concludes that while ALJs can rely on daily activities in assessing a claimant's subjective allegations, there is a critical difference between such activities and the requirements of a full-time job, which ALJs often fail to recognize.  (Pl.'s Br. at 16, citing Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012).)

Plaintiff's argument misses the mark.  The ALJ cited plaintiff's activities, not as proof that she could work full-time, but as evidence that she was not as limited as alleged.  As courts have acknowledged, there is a critical difference between an ALJ improperly saying, "The claimant can perform this range of activities; therefore she can work," see Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013); and an ALJ reasonably saying, "The claimant can perform this range of activities, therefore she can do more than she claims, and is not credible."  Tracie E. v. Saul, No. 1:20-cv-00307-SEB-MPB, 2021 U.S. Dist. LEXIS 81456, at *27 (S.D. Ind. Feb. 12, 2021) (citing Alvarado v. Colvin, 836 F.3d 744, 750 (7th Cir. 2016); Pepper, 712 F.3d at 369).

Plaintiff does not challenge the ALJ's credibility finding in this case; rather, she contests the ALJ's evaluation of the opinion evidence. Pertinent to that argument, the ALJ cited plaintiff's activities as evidence conflicting with Trewyn's assessed marked deficiencies in concentration, persistence, and pace, and in adaptation. (Tr. at 27.) The ALJ cited a number of activities in support of his conclusion that Trewyn overstated plaintiff's limitations, including her part-time work, plans for a craft business, preparing meals, managing money, and maintaining her own household.[6]

Plaintiff argues that the ALJ's error in evaluating Trewyn's report is not harmless, as being absent two days per month on an ongoing basis would, according to the VE, preclude competitive employment. (Pl.'s Br. at 17, citing Tr. at 68.) However, she does not grapple with the ALJ's reasons for rejecting this limitation, i.e., it was speculative, without explanation, and contrary to the treatment notes showing plaintiff generally doing well with good mental status examination findings. (Tr. at 27.) The ALJ specifically relied on Trewyn's note stating: "Michelle is doing well, despite being denied from disability again. She continues to struggle with finances, but always seems to make it work." (Tr. at 1512.)

Finally, plaintiff argues that to the extent the ALJ relied on the agency psychological consultants, his decision was flawed. The consultants found a moderate limitation in

---

[6]In reply, plaintiff contends that the ALJ placed undue weight on her accommodated, part-time work and failed to consider the differences between daily activities and a full-time job. (Pl.'s Rep. Br. at 6.) As discussed above, the only accommodation mentioned in the record is that starting around May 2019 Walmart allowed plaintiff to take two days off per month, if needed, due to her depression and anxiety. Plaintiff testified that she received no other accommodations, and she admitted that she was mentally able to perform her duties at Walmart. As also discussed above, the ALJ did not equate plaintiff's part-time work or any other activity with the ability to work full-time; he cited this as evidence contradicting Trewyn's assessed limitations in concentration and adaptation.

concentration, persistence, and pace, which the ALJ adopted but failed to incorporate into the RFC and hypothetical questions to the VE. She relies on Seventh Circuit case-law holding that a limitation to simple, routine tasks is generally insufficient to capture deficiencies in concentration, persistence, and pace. (Pl.'s Br. at 17, citing Yurt v. Colvin, 758 F.3d 850, 858-59 (7th Cir. 2014); O'Connor-Spinner v. Astrue, 627 F.3d 614, 620 (7th Cir. 2010).)

This argument also misses the mark. The ALJ did not make the same mistake as in the cases plaintiff cites—assuming that a limitation to unskilled work would account for such moderate limitations. The ALJ explained that, to account for plaintiff's moderate deficits in concentration, persistence, and pace, and in adaptation, he limited plaintiff to simple, routine, and repetitive tasks involving only simple decision making and no more than occasional changes in work setting with no fast paced or inflexible production requirements. (Tr. at 24-25.) The Seventh Circuit has approved of similar formulations. See Martin, 950 F.3d at 374. The ALJ also credited Dr. O'Brien's opinion that despite her moderate limitations plaintiff retained the ability to learn, understand, remember, perform, and sustain simple tasks. (Tr. at 25.) The Seventh Circuit has approved reliance on a consultant's narrative RFC accounting for the previous moderate ratings. See Pavlicek v. Saul, 994 F.3d 777, 783 (7th Cir. 2021).

Plaintiff acknowledges that the ALJ added limitations beyond simple, routine, and repetitive tasks, but she contends that he did so only in connection with adaptation, not concentration, persistence, and pace. (Pl.'s Br. at 17.) Plaintiff cites a portion of the ALJ's decision explaining why he found plaintiff more limited than did the psychological consultants, with a moderate rather than mild limitation in adaptation. (Tr. at 25.) Earlier in his decision, the ALJ explained that the additional limitations addressed the third and fourth paragraph B areas. (Tr. at 24-25.) In any event, plaintiff fails to explain why the ALJ was required to specifically

34

relate the additional limitations to concentration rather than adaptation.  See Martin, 950 F.3d at 374 ("The law does not require ALJs to use certain words, or to refrain from using others, to describe the pace at which a claimant is able to work."); see also Buckhanon ex rel. J.H. v. Astrue, 368 Fed. Appx. 674, 678-79 (7th Cir. 2010) ("There is no requirement of such tidy packaging, however; we read the ALJ's decision as a whole and with common sense.").

Nor does plaintiff identify any additional limitations the ALJ should have included.  See Jozefyk v. Berryhill, 923 F.3d 492, 498 (7th Cir. 2019) ("It is unclear what kinds of work restrictions might address Jozefyk's limitations in concentration, persistence, or pace because he hypothesizes none.").  Earlier in her brief, plaintiff faults the ALJ for failing to address Trewyn's opinion that she is moderately limited in the ability to sustain attention and persist at simple, routine tasks for extended (two-hour) periods of time.  (Pl.'s Br. at 15.)  But as the ALJ noted, plaintiff had been able to maintain concentration, persistence, and pace at her Walmart position for nearly two years, working five-hour shifts.  (Tr. at 27.)  At the hearing, plaintiff testified to experiencing crying episodes at work, but she denied any difficulty with tasks requiring concentration, e.g., processing transactions, counting money, or giving change.  (Tr. at 62.)  Moreover, as the Seventh Circuit recently explained:

> A "moderate limitation" is defined by regulation to mean that functioning in that area is "fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1. As the Commissioner points out, "fair" in ordinary usage does not mean "bad" or "inadequate." So a "moderate" limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace.

Pavlicek, 994 F.3d at 783.  Plaintiff fails to demonstrate reversible error in the ALJ's handling of this moderate limitation.

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed.  The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 7th day of January, 2022.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

36